# Recovery of Interest on Advance Payments to State Grantees and Subgrantees

Section 203 of the Intergovernmental Cooperation Act exempts both the states and their subgrantees from accountability for interest earned on federal grant funds pending their disbursement, and such interest may thus not be recovered by the federal government.

February 5, 1982

## MEMORANDUM OPINION FOR THE COUNSEL TO THE DIRECTOR, OFFICE OF MANAGEMENT AND BUDGET

This memorandum responds to your request that this Office advise you whether the federal government may recover interest actually accrued by state grantees and subgrantees on advance payments of grant funds. Section 203 of the Intergovernmental Cooperation Act of 1968, 42 U.S.C. § 4213 (1976), provides that "[s]tates shall not be held accountable for interest earned on grant-in-aid funds, pending their disbursement for program purposes." On the basis of this provision, prior opinions of the Office of Legal Counsel, and three recent decisions of the Comptroller General interpreting that provision, we conclude that the federal government may not recover interest earned by state grantees and subgrantees on advances of federal grant-in-aid funds.

### I.

Section 203 of the Intergovernmental Cooperation Act of 1968, 42 U.S.C. § 4213, which directs the scheduling of transfers of federal grant-in-aid funds to states, provides that transfers of grant funds be made as near as possible to the time of disbursement by the states, and exempts states[1] from accountability for interest earned on these funds pending their disbursement. Section 203 provides:

> Scheduling of Federal transfers to the States
>
> Heads of Federal departments and agencies responsible for administering grant-in-aid programs shall schedule the transfer of grant-in-aid funds consistent with program purposes and applica-

---

[1] Decisions of the Comptroller General have in the past required recipients of federal grants to return to the Treasury any interest earned on such grants prior to their use, unless Congress has specifically precluded such a requirement. *See* 42 Comp. Gen 289 (1962) and cases cited therein.

ble Treasury regulations, so as to minimize the time elapsing between the transfer of such funds from the United States Treasury and the disbursement thereof by a State, whether such disbursement occurs prior to or subsequent to such transfer of funds.

. . . *States shall not be held accountable for interest earned on grant-in-aid funds, pending their disbursement for program purposes.*

42 U.S.C. § 4213 (emphasis added).

You have questioned the applicability of the exemption contained in § 203 to interest *actually* earned by state grantees in view of the Act's mandate that federal grant-in-aid funds not be transferred from the Treasury until such funds are ready for use by the state grantees, the effect of which would minimize the amount of interest accrued by the states. In addition, it is your position that even if § 203 does provide an exemption for interest earned by *state* grantees, the exemption does not extend to local governmental units which are *secondary recipients* of federal grant funds funnelled through the states.

Notwithstanding the Act's purpose to discourage the transfer of federal grant funds to states in advance of the grantees' program needs, we cannot ignore the clear language of the Act which exempts states from accountability for interest in the event that interest *is* earned prior to states' disbursement of funds. Dec. Comp. Gen. B–196794 (Feb. 24, 1981); 59 Comp. Gen. 218 (1980); Dec. Comp. Gen. B–171019 (Oct. 16, 1973); Rehnquist, Office of Legal Counsel, "Recovery of Interest on Excessive Cash Balances of LEAA Funds Held by States and Cities" (Nov. 15, 1971).[2] Moreover, while the question can be raised whether

---

[2] In his 1971 opinion, then Assistant Attorney General Rehnquist gave a clear and concise account of the exemption provision contained in § 203 of the Act:

> Our reading of the legislative history concerning § 203 and the broader objectives of the Intergovernmental Cooperation Act of 1968 as well, leads us to [conclude] that Congress exempted the States from the burden of accounting for interest on grant funds to facilitate the new authorities for commingling Federal funds in the general accounts of the States and the new Treasury techniques such as the letter of credit and sight draft procedures which implemented the Act. *We do not read these, however, as support for the view that Congress intended to impose penalties on those States which accumulated interest on deposited or invested funds and to require a forfeiture of that interest* On the contrary, the [Senate and House] reports emphasize the expectation that very little interest accumulation is expected. It is clear to us that this is because an important objective of the legislation is to require the Federal Government to impose such oversight controls as will result in a scheduling of funds to the States and so prevent any long periods of disuse of funds with resulting buildups and accumulation of windfalls.
>
> *An overall legislative objective is clearly assistance to the States from the Federal Government.* In its very title the Act is described as a measure to "achieve the fullest cooperation * * * to improve the administration of grants-in-aid to the States " For these purposes, among others, the States were relieved of a number of the duties which theretofore had burdened the administration of the grant-in-aid programs, such as the requirements for maintaining funds in separate banks and the requirement of accounting for any interest earned on deposits or investments
>
> We would agree . . . that Congress never intended to permit a State "to abuse agency and Treasury regulations by drawing excessive amounts of cash for investment pending disbursement and still be relieved of having to account for the interest earned on the investment." The legislative history indicates that Congress did not intend that to happen because the Federal Government was expected to prevent it from happening by spacing the disbursement funds on the basis of need.
>
> *Perhaps the most persuasive argument against a plan to hold a State accountable for interest earned is the categorical provision in § 203 stating "States shall not be held accountable for interest earned on grant-in-aid funds, pending their disbursement for program purposes." We do not find a*
>
> Continued

128

this exemption applies to local governmental units which are subgrantees of the states, both this Office and the Comptroller General have examined this issue, and neither has read § 203 to permit the federal government to recover interest earned by local governmental units receiving federal funds as subgrants from the states. *See* Dec. Comp. Gen. B–196794 (Feb. 24, 1981); 59 Comp. Gen. 218 (1980); Dec. Comp. Gen. B–171019 (Oct. 16, 1973); Ulman, Office of Legal Counsel, "Issue Raised by Conflicting Opinions Concerning Interest Earned on Grant Funds by Local Governments" (Mar. 12, 1974); Office of Legal Counsel, Internal Action Memorandum (Feb. 19, 1974). *But see* Rehnquist, Office of Legal Counsel (Nov. 15, 1971), *supra.*

## II.

This Office first considered the applicability of the § 203 exemption to subgrantees of states receiving federal grant-in-aid funds in a 1971 opinion issued by Assistant Attorney General Rehnquist to the Administrator of the Law Enforcement Assistance Administration (LEAA). *See* Rehnquist, Office of Legal Counsel (Nov. 15, 1971), *supra.* In that opinion Assistant Attorney General Rehnquist noted that § 203 of the Act speaks only of relief to "States," a term which is defined in Section 102 of the Act as

> any of the several States of the United States, the District of Columbia, Puerto Rico, any territory or possession of the United States, or any agency or instrumentality of a State, *but does not include the governments of the political subdivisions of the State.*

42 U.S.C. § 4201(2) (emphasis added). Because local governmental units are not encompassed by this definition, he concluded that local governmental units receiving federal funds as subgrantees of the states were *not* exempt from the general requirement that interest earned on federal funds be returned to the United States Treasury:

> [D]espite the Congressional intention to discontinue "future application" of the interest accountability "principle" (H. Rept. No. 1845, 90th Cong., Aug. 2, 1968) the specific mention of the States in § 203 without any express legislative relief to the cities and other local units leaves unchanged the general rule calling for continued accountability by the latter, whether funds are received directly or by subgrant from a State. Although we are not aware of any reason for the distinction in § 203 between "States" and "political subdivisions," it nevertheless exists, and accordingly

contradiction to that clear statement in the Act nor in its legislative history

Rehnquist opinion at 5–6 (emphasis added) Because this Office has continued to maintain the views expressed in Assistant Attorney General Rehnquist's 1971 opinion, which are also consistent with subsequent decisions by the Comptroller General, we do not find it necessary to re-analyze in this opinion the applicability of § 203 to state grantees

> we think that as a matter of law the distinction must be
> maintained.

Rehnquist opinion at 7.

In strictly construing the term "State" in the Act without reference to the Act's legislative history, the Rehnquist opinion failed to distinguish local governmental units which receive grant-in-aid funds *directly* from the federal government from those which are *secondary* recipients of federal grant funds, receiving federal funds as subgrantees of the states. In view of the Act's purpose to assist the states by facilitating the transfers of federal grant funds, as well as by relieving the states of various administrative and accounting duties, we believe that this distinction is critical to the Act's implementation. As subsequent decisions of this Office[3] and the Comptroller General have made clear, a requirement that local governmental units receiving federal grant funds as subgrantees of the states be held accountable for interest earned on these funds would necessarily require state grantees, in contravention of § 203, to be responsible for ascertaining and securing the interest earned by their local subgrantees. In the case of *direct* federal grants to local governmental units, however, state grant administrative machinery is in no way implicated—in these cases, of course, local grantees are directly accountable to the federal government for interest earned on federal grant funds prior to their use. *See* Dec. Comp. Gen. B–196794 (Feb. 24, 1981); 59 Comp. Gen. 218 (Jan. 17, 1980); Ulman, Office of Legal Counsel, "Issue Raised by Conflicting Opinions Concerning Interest Earned on Grant Funds by Local Governments" (Mar. 12, 1974); Dec. Comp. Gen. B–171019 (Oct. 16, 1973).

In 1973, the Comptroller General considered the issue of interest accountability by subgrantees of the states and concluded that "political subdivisions receiving Federal grants-in-aid through State governments are entitled to retain moneys received as interest earned on such Federal funds." Dec. Comp. Gen. B–171019 at 1 (Oct. 16, 1973). In reaching this conclusion, the Comptroller General noted that neither the language nor the legislative history of § 203 of the Intergovernmental Cooperation Act differentiates between grants which the states will disburse themselves and grants involving funds which the states will subgrant to local governments.[4] The Comptroller General stated:

---

[3] *See* Ulman, Office of Legal Counsel, "Issue Raised by Conflicting Opinions Concerning Interest Earned on Grant Funds by Local Governments" (Mar 12, 1974) On Mar. 12, 1974, Acting Assistant Attorney General Ulman responded to a request by LEAA to resolve the differences between the 1971 Rehnquist opinion and a 1973 decision by the Comptroller General which concluded that local governmental units receiving federal grant funds as subgrants from the states were permitted to retain the interest earned on those funds. In his letter, Ulman deferred to the judgment of the Comptroller General regarding the proper interpretation of § 203, noting that "the matter involve[d] the disposition of funds in the settlement of a public account, a matter within [the Comptroller General's] official jurisdiction.   " Ulman, Office of Legal Counsel, *supra* at 3 *See also* Office of Legal Counsel, Internal Action Memorandum (Feb 19, 1974) (discussing issues to be addressed in the Mar. 12, 1974, letter to LEAA)

[4] The Comptroller General referred to a Feb. 19, 1969, memorandum from the Assistant General Counsel for Education, Department of Health, Education and Welfare (HEW) to the Assistant Commissioner for Administration. HEW,which also concluded that the interpretation of § 203 that is most consistent with the Intergovernmental Cooperation Act's purposes and legislative history requires that *all* federal grant funds transferred to states be exempt from interest accountability, without regard to whether the funds are further subgranted by the states:

> [The language of § 203] quite literally instructs us not to hold a State agency accountable for interest earned on grant funds *pending their disbursement*. There is no exception to this instruction

Continued

130

> Thus, it seems clear to us that States are not to be held accountable for interest earned on any grant-in-aid funds pending their disbursement, whether or not the States intend, or are required by the terms of the grant, to subgrant these funds. To hold otherwise would, of course, require the States to assume the burden of accounting for the presumably relatively small amounts of interest which would be earned on these funds in contravention of the legislative intent behind the last sentence in section 203.

*Id*. at 8.

This analysis of § 203 was reaffirmed by the Comptroller General in 1980, with respect to *non*-governmental subgrantees of state recipients of federal grants. *See* 59 Comp. Gen. 218 (Jan. 17, 1980). The Comptroller General concluded that "the same rationale that justifies exempting governmental subgrantees from remitting to the Federal grantor agency interest earned on Federal grant funds received from the States, applies equally to non-governmental subgrantees." *Id*.

Again in 1981, the Comptroller General reiterated his interpretation of § 203 as permitting subgrantees of federal grants to retain the interest earned on funds received by them through the states. *See* Dec. Comp. Gen. B–196794 (Feb. 24, 1981). The Comptroller General's 1981 decision was prompted by a request from the Office of Management and Budget (OMB) to reconsider the current reading of § 203 in light of the difficulties that it poses for sound cash management by the various federal grantor agencies. OMB was, and continues to be, concerned that § 203 provides an incentive to states and their subgrantees to draw on their grant funds prematurely to accrue "free" interest, and thereby frustrate the mandate of Treasury Circular 1075[5] against excessive cash withdrawals. While the Comp-

---

for funds that earn interest pending their disbursement by a local educational agency, or any other agency

To depart from this plain reading of § 203 would require some clear indication of a different legislative intent in its enactment. No such indication is apparent. On the contrary, as the floor manager of the House bill, Mr Reuss, pointed out—

> The first substantive title—title II—calls for improved administration of grants-in-aid to the States * * * In addition it would relieve the States from unnecessary and outmoded accounting procedures now in effect and the maintenance of separate bank accounts while protecting the right of the executive branch and the Comptroller General to audit those accounts

Relief from "unnecessary * * * accounting procedures" is consistent with suspension of the rule requiring the States to account for interest earned on grant funds, regardless of what agency of the State may be in possession of those funds at the time that such interest accrues. *The effect of excluding political subdivisions from the term 'State' must be understood merely to withhold interest forgiveness in programs in which a local educational agency is directly accountable to the Federal Government*.

Dec Comp Gen B–171019 (Oct. 16, 1973) (emphasis added)

[5] Treasury Circular 1075 requires that·

> Cash advances to a recipient organization shall be limited to the minimum amounts needed and shall be timed to be in accord only with the actual, immediate cash requirements of the recipient organization in carrying out the purpose of the approved program or project The timing and amount of cash advances shall be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program costs and the proportionate share of any allowable indirect costs

31 C.F R § 205 4 (1978) *See also* S. Rep No 29, 96th Cong , 2d Sess (1980) on the Supplemental Appropria-

Continued

troller General was sympathetic to the concerns expressed by OMB and indicated that § 203 is being reassessed in light of administrative changes that have taken place since the legislation was passed in 1968, he nevertheless concluded that

> [a]s long as section 203 remains in effect . . . we see no basis for changing our ruling even if this is an obstacle to better cash management. However, we should point out that our decision does not preclude agencies from complying with the three steps mentioned by the Senate Committee on Appropriations, including "[i]nitiating immediate recovery action whenever recipients are found to have drawn excess cash, in violation of Treasury Circular 1075." S. Rep. No. 96–829, 96th Cong., 2d Sess. 14 (1980). Thus, the agencies should monitor their grantees draw of cash and recover any excess.

*Id.* at 2.

Our own reading of § 203 of the Intergovernmental Cooperation Act of 1968, in light of its legislative history, supports the foregoing analyses of the Comptroller General. While we are mindful of the position taken by this Office in the 1971 Rehnquist opinion, we believe that the Act's legislative history, and the accompanying statements of the Act's purposes, cannot support the narrow interpretation of "State" accorded § 203 by that opinion. To exempt state grantees from the interest accountability requirement while requiring that they monitor and collect interest accrued by their *sub*grantees would reimpose the very administrative and accounting burdens of which the Act was intended to relieve the states.[6] Although the Rehnquist opinion did not appear to contemplate such a result, it nevertheless seemed compelled by its narrow reading of "States" to distinguish federal grant funds which are disbursed by the states for state programming needs from those funds which are disbursed by the states to their political subdivisions for local programming needs. In view of the Act's overall legislative objective of assisting the states by improving the administration of grants-in-aid—including the facilitation of grant fund transfers, and relieving states of the burdens of maintaining grant funds in separate bank accounts and accounting for interest earned on deposits or investments—it would make little sense to impose upon states the far more difficult task of accounting for the

---

tions and Rescission Bill, 1980, directing all federal agencies to "take immediate steps to assure compliance with Treasury Circular 1075" by·

(1) Reviewing the periodic reports filed by recipients to ascertain whether they are drawing and holding cash in excess of their current needs,

(2) Auditing a sufficient number of recipient accounts to determine whether they are filing accurate reports on cash in hand; and

(3) *Initiating immediate recovery action whenever recipients are found to have drawn excess cash, in violation of Treasury Circular 1075.*

S. Rep No. 829 at 14 (emphasis added).

[6] Of course, this burden would not be imposed on the states in cases where federal grant funds are transferred *directly* from the federal grantor agencies to local governmental units, without being funnelled through the states. All prior opinions of the Comptroller General and the Office of Legal Counsel, including the Rehnquist opinion, are in agreement that in such cases, the local grant recipients are responsible directly to the federal grantor agency, and are not exempt from interest accountability by operation of § 203.

interest earnings of their subgrantees when the states themselves are exempt from accountability for their own earnings. Thus, we believe that, consistent with the purposes of the Act, § 203 is properly interpreted to exempt interest accountability on all federal grant-in-aid funds that are transferred to the states, regardless of whether such funds are disbursed by the states for their own programming needs or subgranted to local governmental units.

While we are sympathetic to the cash management concerns expressed by OMB, we believe that the Act clearly places the responsibility for implementing sound fiscal policies with respect to federal grant funds with the federal grantor agencies. Section 203 requires the heads of federal departments and agencies who are responsible for administering grant-in-aid funds to schedule the fund transfers in a manner that is "consistent with program purposes and applicable Treasury regulations, so as to minimize the time elapsing between the transfer of such funds from the United States Treasury and the disbursement thereof by a State. . . ." 42 U.S.C. § 4213.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*